Louis D. Benn v. Commissioner.Benn v. CommissionerDocket No. 78020.United States Tax CourtT.C. Memo 1966-8; 1966 Tax Ct. Memo LEXIS 271; 25 T.C.M. (CCH) 22; T.C.M. (RIA) 66008; January 12, 1966*271 Norbert J. Heubusch, for the petitioner. James D. Burroughs, for the respondent. RAUMMemorandum Findings of Fact and Opinion Respondent determined the following deficiencies in income tax for the years 1953 and 1955 and addition to tax for the year 1953: Addition to tax,Sec. 293(b),YearDeficiencyI.R.C. 19391953$26,751.43$13,375.721955552.51 Petitioner concedes that the assessment and collection of any deficiency for the year 1953 is not barred by the statute of limitations and that respondent did not err in determining the deficiency for the year 1955. The issues are (1) whether petitioner understated his taxable income for the year 1953; and (2) whether part of the deficiency determined for that year was due to fraud with intent to evade tax. Findings of Fact Some of the facts have been stipulated and, as stipulated, are incorporated herein by reference. Petitioner is a resident of Miami, Florida. His Federal income tax return for the year 1953 was filed on March 4, 1954 with the district director of internal revenue, Jacksonville, Florida. Therein he reported his income on a calendar year, cash receipts and*272 disbursements basis. The statutory notice of deficiency for the year 1953 was mailed to petitioner on November 5, 1958. During the year 1953, petitioner caused to be formed the following Florida corporations: Hudson Investors Company, Inc. (formed June 18, 1953) Capital Investors Company, Inc. (formed May 15, 1953) All Fiberglass Awning Company (formed December 11, 1953) Villa Hermosa Corporation (formed December, 1953) These corporations were used by the petitioner as mere conduits for his benefit. They were not taxable entities during the year 1953, and no Federal income tax returns were filed by them or in their behalf for that year. Notes from Sale of Key West Ice Company, Inc. In July, 1951, petitioner and Morris Glantz acquired a 99 year lease on certain land located in Key West, Florida, on which was situated an ice manufacturing plant. They formed the Key West Ice Company, Inc., and transferred the lease and certain ice manufacturing equipment to the corporation. They were "partners" in this venture. On March 12, 1952, prior to the start of the actual ice manufacturing business, petitioner and Glantz sold all of the stock of Key West Ice Company, Inc., to Virginia*273 E. and Albert E. Peirce for $75,000. Petitioner and Glantz each received in full payment for the stock the amount of $37,500 represented by promissory notes bearing interest at six percent per annum with various maturity dates. The notes were in small denominations, none larger than $2,500. Each note was signed by Virginia E. Peirce and V. E. Cates (Virginia Peirce is also known as V. E. Cates) and guaranteed as to payment of principal and interest by Key West Propane Gas Corporation, which corporation was owned by Virginia E. Peirce and her husband. The notes received by petitioner and Glantz from Virginia E. Peirce as a result of the sale of the Key West Ice Company were identical as to amounts, dates of payment, and priority of payment. As a result of the sale of the stock of the Key West Ice Company, petitioner had $30,000 in notes due from Virginia E. Peirce as of January 1, 1953. A total of $7,500 of the notes had been collected in 1952. Petitioner had a cost basis in the stock of the Key West Ice Company in the amount of $23,168.93. He realized a net profit of $14,331.07. Petitioner reported the sale of his stock in the Key West Ice Company on his 1952 income tax*274 return on the installment basis. The remaining cost basis which petitioner had in the promissory notes of $30,000 which he held as of January 1, 1953, was $18,533.93. Acquisition of Hialeah Health Center William D. Bruce and his wife conceived the idea of forming the Hialeah Health Center, sometimes hereinafter referred to as the health center. Bruce discussed the project with Paul Q. Adams, who agreed to invest in the venture. Bruce arranged to purchase the required lots and obtained a $60,000 mortgage from Frank Watkins to finance the project. Adams was a building contractor and constructed the health center. The health center was completed and operated by Bruce and Adams for approximately four or five months. Bruce and Adams each owned an undivided one-half interest in the health center. Adams and Bruce had a disagreement over the operations of the health center and Adams desired to withdraw from the venture. Bruce and his wife commenced an action in the Circuit Court of the Eleventh Judicial Circuit in and for Dade County, Florida, against Paul Q. Adams and his wife for dissolution of the partnership and an accounting. Bruce did not desire to sell his interest in the*275 health center and made several attempts to obtain financing to purchase Adams' interest. He "put out several feelers" through his friends and people in the mortgage business in an effort to obtain funds to purchase the interest of Adams. As a result of these "feelers", James T. Benn, the brother of petitioner, became aware of the health center and negotiated with Bruce and Adams for its purchase. James T. Benn offered them a deal which they thought was satisfactory and Bruce agreed to sell to him since Adams preferred such a sale rather than have Bruce borrow funds to acquire his interest. Prior to the acquisition of the health center, James T. Benn persuaded Morris Glantz to purchase an interest in it. Glantz gave James T. Benn a total of $22,500 in notes which he had received from Virginia E. Peirce in connection with the sale of the Key West Ice Company. The Hialeah Health Center was to be purchased in the name of Hudson Investors Company, Inc. Glantz was to receive fifty percent of the stock of Hudson Investors Company, Inc. for the $22,500 in notes which he had given to James T. Benn. At the request of James T. Benn, Hudson Investors Company, Inc., was incorporated by Attorney*276 William B. Roman for the purpose of acquiring title to the Hialeah Health Center. Morris Glantz had nothing to do with the formation of Hudson Investors Company, Inc., nor did he engage in the negotiations for the acquisition of the health center from Adams and Bruce. James T. Benn later returned $20,000 in notes to Glantz and Glantz got out of the deal to acquire the Hialeah Health Center. James T. Benn never returned a $2,500 note to Glantz and Glantz lost the $2,500 note on the deal. The notes returned by James T. Benn to Glantz were notes owned by the petitioner which he had received on the sale of the Key West Ice Company. The notes were assigned to Glantz by petitioner without recourse. Glantz had no objection to receiving notes of the petitioner since the notes were identical to those which Glantz had received on the sale of the Key West Ice Company. James T. Benn told Glantz that he had "used" Glantz's notes and "could not return them." When Glantz received the $20,000 in notes from James T. Benn, he considered it a cancellation of their previous association and not a sale of any interest in Hudson Investors Company, Inc. The original notes in the amount of $20,000*277 which Glantz had given to James T. Benn were used by Benn to purchase the interest of Paul Adams in the Hialeah Health Center on behalf of petitioner. When Glantz withdrew from the Hialeah Health Center deal at the suggestion of James T. Benn, he received only the $20,000 of notes endorsed over to him by the petitioner. He received no cash. On March 26, 1953, James T. Benn entered into separate purchase agreements with Adams and Bruce, each of whom owned an undivided one-half interest in and to the Hialeah Health Center and twelve unimproved adjoining lots. In acquiring this property James T. Benn was acting on behalf of petitioner with petitioner's full knowledge and acquiescence. At the time the purchase agreements were executed, the lawsuit instituted by Bruce against Adams for the dissolution of the partnership and an accounting was still pending. The amount of $500 was paid by petitioner to Roland J. Lavelle, an attorney, to have this lawsuit dismissed. On June 16, 1953, Adams and Bruce deeded the Hialeah Health Center, subject to a mortgage, and the twelve adjoining unimproved lots to Hudson Investors Company, Inc. For his interest, Adams was assigned $7,500 of the promissory*278 notes petitioner received from the sale of the Key West Ice Company and $20,000 of the promissory notes which James T. Benn had obtained from Glantz. Negotiations were entered into between Bruce and James T. Benn to determine the consideration to be received by Bruce for his undivided one-half interest in the health center and adjoining lots. Benn was "a very persuasive" person. He kept assuring Bruce that Bruce could trust him, and during the negotiations Bruce did trust him. He offered several propositions to Bruce. The first proposition involved an outright purchase of Bruce's interest in the health center for $17,000. Benn subsequetly offered Bruce a twenty-five percent interest in a corporation by the name of Hialeah Health Center, Inc., in lieu of any money. Bruce liked the latter proposition because he felt it would permit him to satisfy his desire to continue to participate in the operations of the health center. During the course of the negotiations, Benn had Bruce sign many documents, some of which were "torn up immediately". The documents were confusing to Bruce because Benn would "shove them" at him and want them executed immediately, saying "You will just have to trust*279 me if you want this thing done and done in your favor." An agreement, dated March 26, 1953, bears the signature of Bruce and that of his wife purportedly signed by Bruce as attorney in fact. Therein Bruce agreed to sell his undivided one-half interest in the health center and adjoining lots to James T. Benn for $1,000 plus a five-year lease plus option to purchase. The agreement stated that the gross rental was to be $102,000, payable in monthly installments of $1,700 per month beginning June 1, 1953 to and including May 1, 1958. Bruce admits that his signature on this document appears to be genuine, but does not remember ever seeing this document and does not recall signing it. He never received the $1,000 set forth therein. An unnotarized deed, dated June 15, 1953, bears the signatures of William D. Bruce and his wife, Florence A. Bruce. Therein it is stated that they, for and in consideration of the sum of $7,300 "to them in hand paid" by the Hudson Investors Co., Inc., conveyed to that corporation their undivided one-half interest in the Hialeah Health Center and adjoining lots. Bruce has no recollection of signing this deed and never received the consideration of $7,300. *280 Hialeah Health Center, Inc. was organized in the early part of 1953 by Attorney Herbert Blume at the request of James T. Benn. Blume was paid a fee of $200 for his services. The president of Hialeah Health Center, Inc. was Alicia Carvell. It acquired a five-year lease of the health center from Hudson Investors Company, Inc. at a monthly rental of $1,700. The lease was executed by and between Hudson Investors Company, Inc. and Hialeah Health Center, Inc. on June 22, 1953. It was the only asset of Hialeah Health Center, Inc. The original intention in the formation of Hialeah Health Center, Inc. was that Alicia Carvell, Mary Kennelly, Karen Bowman, and William D. Bruce were each to own 25 percent of the stock. The negotiations between Alicia Carvell, Mary Kennelly, Karen Bowman, and William Bruce, as to their interests in Hialeah Health Center, Inc., were handled by James T. Benn. James T. Benn represented to Bruce that it was necessary for him to execute demand notes payable to him in the amount of $20,000 so that the mechanics of Bruce's acquiring a 25 percent interest in Hialeah Health Center, Inc. could be worked out. James T. Benn told Bruce that he would mark the notes*281 "paid" and that this would represent payment for Bruce's 25 percent interest in Hialeah Health Center, Inc. This arrangement was to be consummated in lieu of Bruce receiving any money for his undivided one-half ownership of the health center. Ten demand notes totalling $20,000 were prepared in the office of Herbert Blume. Each note provided, in part, as follows: $2,000.00 Miami, Fla. June 22nd, 1953 ON DEMAND… after date we promise to pay to the order of JAMES T. BENN TWO THOUSAND and 00/100ths Dollars with interest after maturity at the rate of 6 per cent, per annum until paid for value received negotiable and payable at office of FREDERICK SILVER, ESQ., 110 E. 42 St., N.Y.C., N. Y., and if not paid at maturity, this note may be placed in the hands of an attorney at law for collection: and, in that event it is agreed and promised by the makers and endorsers, severally, to pay additional thereto all costs including reasonable attorney's fees that said Payee may incur or be put to in the collection hereof, having deposited with the said Payee as collateral security for the payment of this note, and any note given in extension of renewal thereof, and as security for the payment*282 of any other liability or liabilities of the undersigned to said Payee, whether now existing or hereafter arising, the following securities, viz: Stock Certificate No. 4 of HIALEAH HEALTH CENTER, INC., a Florida corporation, standing in the name of William D. Bruce the present market value of which is hereby estimated to be TWENTY THOUSAND AND 00/100ths Dollars: * * * James T. Benn had the notes prepared and they were presented to Bruce in Blume's office. Bruce had assumed that the notes would be marked "paid" immediately and that he would receive a 25 percent interest in the Hialeah Health Center, Inc. When he asked James T. Benn to mark the notes "paid" Benn refused to do so. Bruce then became suspicious, picked up the notes and left Blume's office. He was positive that if he signed them Benn would make a claim against him for the amount of the notes. Benn followed Bruce into the hall and tried to quiet him, saying "It takes time to settle these things" and "I will work it out to your satisfaction". Blume told petitioner that it could be straightened out to Bruce's satisfaction, but that the mechanics had to be carried out in the proper manner. Bruce assumed from his conversations*283 with James T. Benn and Blume that the deal would be consummated in a form acceptable to him and that he would receive a 25 percent interest in Hialeah Health Center, Inc. He went to the health center and, as administrator, arranged for the completion of some improvements on the grounds surrounding the building. These improvements consisted of putting in some fill, sod, and shrubbery, and a concrete circle around the front of the building. He expended some of his funds for the material and labor needed to make these improvements, and was reimbursed for those expenditures by Alicia Carvell who received the money to pay him from James T. Benn. When he received reimbursement for any expenditure he was required to sign a receipt. In June and July 1953, he signed ten receipts for various amounts totalling $322.20 which showed on their face that those amounts were for materials and labor at the health center. He also signed two receipts in June 1953, in which he acknowledged the receipt from Alicia Carvell of $50 for "Loan" and $55 for "2 payments on Bruce Automobile". The words "Personal Loan" were inserted in writing at the top of these two receipts. James T. Benn always obtained a receipt*284 for any amounts paid to individuals, and on various occasions, when he had more than one receipt from an individual, he would have that individual sign a combined receipt for the total amount with the explanation that he had destroyed the other receipts. In 1953 Bruce signed the following receipt: June 9th, 1953 Received of Alicia B. Carvell, the sum of Six Hundred ($600.00) Dollars in cash and Bank Checks, the receipt of which aforesaid amount is hereby acknowledged. The undersigned William D. Bruce agrees to reimburse and repay the aforesaid amount at the time of closing of his equity in and to the Real and Personal Property located at 195 W. 27th Street, Hialeah, FLORIDA, PLUS HIS EQUITY IN AND TO THE ADJACENT TWELVE (12) LOTS, WHICH SAID LOTS ARE CONTIGUOUS TO THE IMPROVED Real Property. The aforesaid amount is a loan of monies from Alicia B. Carvell to William D. Bruce. Bruce did not borrow $600 from Alicia B. Carvell, and she does not recall seeing Bruce receive that amount. James T. Benn asked Bruce to sign this receipt. Bruce's recollection is that he signed this receipt with the understanding the $600 represented the total amount expended for sod, fill, shrubbery, *285 and labor for Hialeah Health Center, Inc. While Bruce was performing services at the health center, he and his wife and two children resided at the health center and had their meals there, and Bruce received gasoline for his automobile. He did not receive any compensation for his services and funds needed for the payment of debts incurred for family expenses came from compensation received by his wife for services she rendered as registered nurse at the Jackson Memorial Hospital. Under date of July 25, 1953, Bruce signed a document bearing the caption "Assignment of Stock". It states that Bruce, in consideration of $1,250 (in cash), "the receipt whereof is hereby acknowledged" assigns and transfers to the Capital Investors Co., a Florida Corporation, all of his right, title and interest in and to all of his shares of Capital Stock of the Hialeah Health Center, Inc., and any and all other right, title and interest that he has or may have in and to the Hialeah Health Center, Inc. Bruce does not remember this document in its present form and did not receive the consideration of $1,250 the receipt of which he acknowledged by signing the document. Bruce never knew that he "was being*286 taken" and assumed at all times that his dealings with James T. Benn were legitimate. James T. Benn kept assuring Bruce that he would take care of him. Bruce never received any money or stock for his undivided one-half interest in the Hialeah Health Center. In the latter part of 1953 James T. Benn told Bruce that he would have to move out of the quarters which he and his family were occupying in the health center because they were needed for administrative work and the other three partners objected to their being occupied by Bruce and his family. When Bruce left the health center he was sick with bleeding ulcers and during the Christmas holidays worked as a substitute employee in the post office in order to obtain funds to pay his debts. Lawyers with whom he conversed about instituting an action against James T. Benn informed him that he did not have the proof necessary to take Benn to court and establish that he had received nothing for his interest in the health center and adjoining lots. Sale of Stock of Hudson Investors Company, Inc. Petitioner formed Capital Investors Company, Inc. on May 15, 1953, and later transferred to it all of the capital stock of Hudson Investors*287 Company, Inc., which owned the Hialeah Health Center and the 12 unimproved adjoining lots. A. L. Shirley and Grace A. Shirley, his wife (hereinafter referred to as the Shirleys) owned a furnished residence located at 7225 Belle Meade Boulevard (hereinafter referred to as the Belle Meade residence), Miami, Florida, and the Ott ranch located in Marion County, Florida. They advertised the Belle Meade residence for sale or trade in a Miami newspaper, and James T. Benn came to see the property. James T. Benn did not desire to purchase the Belle Meade residence, but offered a trade of the Hialeah Health Center with 12 adjoining lots and a residence located at 1226 N.E. 97th Street, Miami Shores, Florida (hereinafter referred to as the 97th Street residence), for the Belle Meade residence and the Ott ranch. The 97th Street residence was owned by James T. Benn and was purchased by him for his personal benefit. Title to the property was put in the name of petitioner for reasons known to James T. Benn. A. L. Shirley negotiated with James T. Benn. A trade of equities was worked out between them. Shirley agreed to trade his equity in the Belle Meade residence and the Ott ranch plus two*288 notes totalling $24,830 for what he assumed to be James T. Benn's equity in the Hialeah Health Center and 12 adjoining lots and the 97th Street residence in Miami Shores, plus $10,000. Prior to trading equities, Shirley and James T. Benn discussed the fair market value of the various properties. The Ott ranch contained 3,320 acres and was valued at $50 per acre. The Belle Meade residence was valued at $98,500. The Hialeah Health Center was valued at $175,000. The 97th Street residence was valued at $45,000. The Ott ranch had two outstanding mortgages totalling $60,000. There was an outstanding mortgage on the Belle Meade residence in the amount of $16,000. The Hialeah Health Center had a first mortgage on it of $60,000 and a mortgage of $2,000 on the 12 adjoining lots. On July 18, 1953, Capital Investors Company, Inc., through Frederick Silver, a New York attorney, entered into an agreement with the Shirleys. Therein the Shirleys agreed to convey to Capital Investors Company, Inc., the Belle Meade residence and two promissory notes made and executed by the Mid-Florida Gas Company, each in the amount of $12,415, and, in exchange therefor, Capital Investors, Inc., agreed to pay*289 the Shirleys $10,000 in cash and convey to them all of the issued and outstanding stock of Hudson Investors Company, Inc., which owned the Hialeah Health Center and the 12 unimproved adjoining lots. The health center was to be transferred subject to a lease agreement between Hudson Investors Company, Inc., and Hialeah Health Center, Inc. The lease was used to induce the Shirleys to enter into an exchange of the various properties. The 97th Street residence was originally included in the agreement of July 18, 1953, between Capital Investors Company, Inc., and the Shirleys. It was deleted from the agreement by both parties at the request of James T. Benn who did not give any reason for its deletion. The original agreement fully executed by all the parties thereto made no reference to the Ott ranch or any trust to be placed thereon by the purchasers. Universal Investors Company was organized by Herbert L. Blume at the request of James T. Benn for the purpose of acquiring title to the Ott ranch in Marion County, Florida. On July 18, 1953, an agreement was entered into between the Shirleys and Universal Investors Company. Therein the Shirleys agreed to convey to Universal Investors*290 Company the Ott ranch, consisting of 3,320 acres, subject to an encumbrance in the form of two mortgages not exceeding $60,000, and, in exchange therefor, Universal Investors Company agreed to convey to the Shirleys the 97th Street property and to give to the Shirleys a purchase money (third) mortgage on the Ott ranch in the amount of $53,000. The Shirleys entered into the agreement with Universal Investors Company, Inc. at the request of James T. Benn because he did not want the complete exchange in one agreement with Capital Investors Company, Inc. James T. Benn wanted the Belle Meade residence and the Ott ranch to be conveyed to different corporations. On July 20, 1953, an agreement was executed between the Shirleys and James T. Benn. This agreement provided for the exchange of the Belle Meade residence and Ott ranch by the Shirleys with James T. Benn for $10,000 in cash, the 97th Street residence and the Hialeah Health Center and the 12 unimproved adjoining lots. In addition, James T. Benn was to give a purchase money (third) mortgage to the Shirleys on the Ott ranch in the amount of $53,000. No mention was made of the two Mid-Florida Gas Company notes in the amount of $12,415*291 each which A. L. Shirley had originally agreed to exchange. The July 20, 1953 agreement between James T. Benn and A. L. and Grace A. Shirley was entered into at the request of James T. Benn. The Shirleys had no objection to the change as long as the complete deal was included in the exchange. On July 24, 1953, an addendum to the property agreement of July 20, 1953 was executed by the Shirleys and James T. Benn. This addendum contained an option whereby the Shirleys could assign over the two Mid-Florida Gas Company notes in the amount of $12,415 each in lieu of assuming a second mortgage on the Hialeah Health Center. The Shirleys were also given an option to accept the stock of Hudson Investors Company, Inc., or title to the properties. The addendum was prepared after James T. Benn and Ralph Adams had inspected the Ott ranch. It was dictated by James T. Benn. At the request of James T. Benn, a deed was drawn and signed by the Shirleys on July 29, 1953, transferring the Ott ranch to Capital Investors Company, Inc. This deed was delivered in escrow to the Drummond Title Company and was not used. On August 7, 1953, the Shirleys sent Troy Huffman of the Drummond Title Company a*292 telegram advising that they would sign a new deed conveying the Ott ranch to Universal Investors Company. This was done at the request of James T. Benn. The Shirleys had no objection to deeding the ranch to Universal Investors Company since they were to receive the properties for which they bargained. On August 8, 1953, the Shirleys transferred the Ott ranch by warranty deed to Universal Investors Company. On August 7, 1953, the 97th Street residence was transferred to the Shirleys by warranty deed executed by the petitioner and his wife, Glendene Benn. On or about August 13, 1953, Capital Investors Company, Inc. through the Drummond Title Company, as Escrow Agent, paid or transferred to the Shirleys the following: (a) Hudson Investors Company, Inc., stock certificate Nos. 2 and 3, each for 50 shares of stock issued to Louis D. Benn and endorsed by petitioner in blank. This constituted all of the outstanding stock of Hudson Investors Company, Inc. (b) Cashier's check in the amount of $10,000.00 in favor of the Shirleys. In exchange therefor, Capital Investors Company, Inc., received from the Shirleys the following: (a) Net proceeds of two Mid-Florida Gas Company promissory*293 notes in the amount of $20,996.37. The face value of each of the two notes was $12,415.00. The notes were discounted and certain expenses deducted to arrive at the net proceeds of $20,996.37. (b) Furnished residence located at 7225 Belle Meade Boulevard, Miami, Florida. The Shirleys regarded the whole exchange as one transaction from their standpoint. As long as the various properties were included in the exchange, they did not object to deeding the Ott ranch and Belle Meade residence in any manner requested by James T. Benn. The transactions involving the various exchanges of properties were finally consummated in accord with the original property exchange agreements of July 18, 1953, between the Shirleys and Capital Investors Company, Inc., and between the Shirleys and Universal Investors Company. Petitioner had nothing to do with the purchase of the Ott ranch, and, to the extent that the foregoing exchanges involved the Ott ranch and the 97th Street residence, James T. Benn was not acting on behalf of petitioner. Universal Investors Company leased the Ott ranch to Consolidated Ranch Company for one year. The lease was negotiated by James T. Benn. Petitioner had nothing*294 to do with the lease. Herbert L. Blume received a $1,500 check made payable to Universal Investors Company from Consolidated Ranch Company and deposited it in his trust account. He disbursed $1,100 of the $1,500 to James T. Benn. Approximately four months after the Shirleys deeded the Ott ranch to Universal Investors Company they started foreclosure proceedings on the $53,000 third mortgage, and that mortgage was foreclosed in 1954. After the Shirleys repossessed the ranch it was sold by them in 1956 for $50 per acre. Sale of Stock of All Fiberglass Awning Company, Inc. Petitioner entered into an agreement for the exchange of certain real estate with John Borgo and his wife, Phillip V. Fresia and his wife, and Lucy Fresia on December 3, 1953, which agreement was supplemented on December 18, 1953. Under the terms of the agreement of December 3, 1953, and supplemental agreement of December 18, 1953, Borgo, Fresia, and Lucy Fresia were to organize the Villa Hermosa Corporation and transfer to it the Villa Hermosa Hotel properties, legally described as Lots 16-19 and 21, Block 28, Hollywood, Florida. Petitioner agreed to transfer title to the Belle Meade residence, Arch Creek*295 Parcel 107 (less SW 1/4), and the Ingleside building at 4605 East Tenth Lane, Hialeah, Florida, legally described as Lot 2, Block 13, Ingleside Park, which included certain equipment and fixtures, to All Fiberglass Awning Company, Inc., a corporation to be organized by petitioner. The parties then agreed to exchange the capital stock of their respective corporations (All Fiberglass Awning Company, Inc., and Villa Hermosa Corporation). In addition, petitioner agreed to pay cash of $8,584 and reimburse Borgo and the other parties for reasonable costs and expenses incurred in the trade. On or about December 11, 1953, petitioner caused All Fiberglass Awning Company, Inc., a Florida corporation, to be formed, and paid William Roman a fee for services rendered by him in connection with its incorporation. On the same date Capital Investors Company, Inc., transferred to that corporation the Belle Meade residence and the following properties, which were in petitioner's name: (a) Arch Creek Estates, Parcel 107, with the exception of the S.W. quarter thereof. (3 vacant lots zoned commercial) (b) Ingleside Building, at 4605 East Tenth Lane, Hialeah, Florida, legally described as Lot 2, Block*296 13, Ingleside Park, with improvement thereon. The Ingleside building, at 4605 East Tenth Lane, Hialeah, Florida, contained equipment and material with a fair market value of $4,500 which was also transferred to All Fiberglass Awning Company, Inc., by petitioner. Pursuant to the executed agreements, Villa Hermosa Corporation, a Florida corporation, was formed by Borgo and Fresia and Lucy Fresia and they conveyed to that corporation the Villa Hermosa Hotel properties, legally described as Lots 16-19 and 21, Block 28, Town of Hollywood, Florida, including all real and personal properties situate thereon. On December 18, 1953, petitioner transferred and delivered all the outstanding stock of All Fiberglass Awning Company, Inc., to Borgo and Fresia and Lucy Fresia, and in addition thereto, paid $10,476.34 in cash to consummate the transaction. The additional amount of $225 was paid to John V. Deegan as a real estate broker's commission. In exchange or in return for the delivery of the properties transferred to Borgo and Fresia and Lucy Fresia, petitioner received on December 18, 1953, from Borgo and Fresia and Lucy Fresia all of the outstanding stock of Villa Hermosa Corporation, *297 which corporation held the incidents of ownership of the Villa Hermosa Hotel, free and clear of any encumbrance. The Villa Hermosa Hotel was owned by petitioner on December 31, 1953. In determining the fair market value of the hotel as of December 31, 1953, respondent took into consideration that an agreement had been executed on December 21, 1953, to sell the hotel for $100,000. In determining the fair market value, respondent allowed the discount on the two mortgages received in the sale, which were subsequently sold. Petitioner was given the benefit of the discount in 1953, instead of 1954. In the exchange of properties with Borgo and Fresia and Lucy Fresia, petitioner had additional basis in the properties transferred or other costs in the following amounts: (a) $1,419.11 paid to A.C. Paoli, attorney at law, for miscellaneous expenses incurred by petitioner. The expenditures were made as follows: DatePurposeAmount12-04-53Paid to R. A. Gray, Secre-tary of State, for VillaHermosa Corporation stock$ 19.0012-21-53Paid to Clerk, Circuit Court1.8012-23-53Taxes paid on residence lo-cated at 7225 Belle MeadeBoulevard, Arch Creek Es-states, Parcel 107 (less SW1/4) and Lot 2, Block 13, In-gleside Park, transferred bypetitioner to All FiberglassAwning Company1,333.3112-23-53Payment made to HymanDorosinky on mortgage heheld on Lot 2, Block 13, In-gleside Park65.00Total$1,419.11*298 (b) $900 paid to First Federal Savings & Loan Association on the mortgage encumbering the residence at 7225 Belle Meade Boulevard. The $900.00 was credited to interest and principal in the amounts and on the dates indicated below: Date ofCreditedCreditedPay-on Inter-on Prin-mentestcipal8-22-53$ 62.92$117.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.46117.5410-22-5361.99118.0112-02-5361.5112-02-5361.7656.7312-24-53180.00Totals$310.64$589.36(c) $1,139.29 paid for the acquisition of Lot 2, Block 13, Ingleside Park, improved with warehouse from Washington C. Conger, Jr., on June 23, 1953. (d) $455.00 paid to Hyman Dorosinky, who held a mortgage on Lot 2, Block 13, Ingleside Park. The $455.00 was credited to interest and principal in the amounts and on the dates indicated below: Date ofAmountPay-of Pay-Inter-Prin-mentmentestcipal6-27-53$ 65.00$ 40.00$ 25.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.0039.7925.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.0039.5825.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.0039.3725.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.0039.2625.8410-29-5365.0038.9426.0611-26-5365.0038.7226.28Totals$455.00$275.66$179.46Basis of Petitioner*299 in Parcel 107, Arch Creek Estates Parcel 107 in the Arch Creek Estates consisted of four business lots. It was deeded to petitioner on March 14, 1950. There were no loans against it at that time. Negotiations for the acquisition of Parcel 107 were conducted by petitioner with a Mrs. Williams. Petitioner sold a home to her and Parcel 107 was taken in exchange. The amount of $1,500 was allowed petitioner toward the purchase of the parcel for his equity in the home. In addition petitioner paid Mrs. Williams $915. The deed dated March 14, 1950, conveying Parcel 107 to petitioner, was recorded in the public records of Dade County Florida, and Federal documentary revenue stamps in the amount of $3.40 were affixed to the deed. Petitioner transferred Parcel 107 to Ralph Adams in 1950 for a note in the amount of $4,500. No cash was received on the sale. Ralph Adams sold Parcel 107 to Daniel Abrahams in December, 1950, in exchange for mortgages. Title to the parcel was transferred to Abrahams. In the sale of Parcel 107 to Daniel Abrahams, Ralph Adams was acting on his own behalf and not as an agent of petitioner. After Parcel 107 was deeded to Daniel Abrahams, Ralph Adams held*300 mortgages on the property and petitioner had the note which he had received at the time he sold the parcel to Adams. A second mortgage on Parcel 107, which was not recorded, was transferred to Harry F. Strenglein as security for $1,200. This mortgage was originally made by Daniel Abrahams to Ralph E. Adams and subsequently assigned by Adams to Strenglein. Petitioner paid Strenglein $1,000 in September, 1952, for the second mortgage in order to get him to release his claims against Parcel 107. Petitioner reacquired Parcel 107 from Daniel Abrahams. In connection with the reacquisition of Parcel 107 petitioner made an airplane trip to Chicago to get a quitclaim deed from Abrahams, and made expenditures for airplane tickets to and from Chicago and for food and lodging while in Chicago. Those expenditures amounted to $225. In 1953, as already noted, petitioner transferred to All Fiberglass Awning Co., Inc., three of the four lots in Parcel 107. One of the lots (S.W.-1/4) in Parcel 107 was sold in 1954. Sale of Villa Hermosa Hotel On December 21, 1953, petitioner, through his agent, Villa Hermosa Corporation, entered into an agreement to sell the real, personal, and mixed properties*301 known as Villa Hermosa Hotel to Camp Ideal, Inc., a New York corporation, for $100,000, which was paid as follows: (a) $3,000.00 by check on December 22, 1953. (b) $7,000.00 by check on January 4, 1954. (c) $55,000.00 Purchase money first mortgage and note against Villa Hermosa Hotel Properties dated January 9, 1954. (d) $35,000.00 First mortgage on real and personal properties located in Staten Island, New York, known as Camp Ideal, dated January 4, 1954. On January 9, 1954, petitioner caused the Villa Hermosa Hotel properties to be conveyed to Camp Ideal, Inc., and received the consideration of $100,000 consisting of $10,000 in cash and two mortgages in the respective amounts of $55,000 and $35,000. On January 26, 1954, the $35,000 first mortgage dated January 4, 1954, was assigned to Curtis E. Neuman and Amalie E. Neuman, his wife, by petitioner's agent, Villa Hermosa Corporation, for the amount of $30,000 which was paid to petitioner on February 10, 1954, and deposited to petitioner's agent's account in Chase National Bank, 42d Street Branch, New York City. During February ($1,200) and March ($3,532.50), 1954, petitioner received a total of $4,732.50 on the $55,000*302 purchase money mortgage and note, leaving an unpaid principal balance of $51,000. The $4,000 principal and the $732.50 interest were deposited in the petitioner's agent's account in the Chase National Bank. On April 5, 1954, the $51,000 mortgage and note was purchased by Walter Kirschner for $40,737.50, which amount was deposited in the petitioner's agent's account in the Chase National Bank for the benefit of the petitioner. On the sale by the petitioner of the Villa Hermosa Hotel to Camp Ideal, Inc., a real estate commission was paid to Nicholas Terranova in the amount of $2,000. Of this amount $500 was paid to Terranova by Attorney A. C. Paoli on December 22, 1953. The remaining $1,500 was paid to Terranova on January 11, 1954. The internal revenue agent who examined petitioner's return for the year 1954 determined that there was no deficiency in tax of petitioner for that year. In making this determination, he treated the sale of the Villa Hermosa Hotel to Camp Ideal, Inc. as a taxable transaction of petitioner in 1954, and applied the $2,000 commission paid to Terranova as an offset against the selling price received in that year. Miscellaneous Transactions During the*303 taxable year 1953, petitioner had interest income in the amount of $496.56, which was reported in his income tax return for that year. On June 8, 1953, petitioner assigned or caused to be assigned one of the Peirce notes in the principal amount of $2,500 to Mary L. Kennelly and Karen D. Bowman for and in consideration of $2,387.50, which was deposited to petitioner's personal bank account. The cost basis to petitioner of the $2,500 note was $1,544.49. Petitioner acquired Lot 9, Block 4, Ruck's Park for $1,500 in 1949 from Mrs. Tennyson in exchange for a home petitioner owned. Petitioner sold this lot to Juan Rachmuth for $2,500 on July 23, 1953, and made a profit on the sale of $854.93. Petitioner paid William Roman $600 for incorporating All Fiberglass Awning Company, Inc., and Hudson Investors Company, Inc. Miscellaneous Facts Bearing on Fraud The examination of petitioner's 1953 income tax return resulted from an investigation of the income tax returns of James T. Benn, brother of petitioner. Petitioner intended to represent to the Government that the transactions reported in his 1953 return were his transactions and they were treated as his since he reported them on*304 his return and both he and James T. Benn told the examining agent that they were his transactions. On June 29, 1957, petitioner was served an administrative summons as a witness in connection with an investigation then in progress concerning the possible criminal recommendation by the Intelligence Division of the Internal Revenue Service as to James T. Benn, petitioner's brother, for the taxable years 1952 through 1955. Petitioner appeared before agents of the Internal Revenue Service on July 10, 1957, in response to this summons. He was represented by legal counsel. Based upon the recommendation of his legal counsel, he claimed privilege against self incrimination and refused to answer some of the questions propounded to him. Petitioner did not cooperate with the examining agent until a jeopardy assessment was made against him after the completion of the civil investigation, and the agents of the Intelligence and Audit Divisions of the Internal Revenue Service had made recommendations for possible criminal prosecutions of petitioner and his brother, together with the recommendation that an addition for fraud be added to their civil liabilities for Federal taxes for the years 1952*305 through 1955. Petitioner appeared voluntarily before the agents on October 29, 1958, and days following through November 5, 1958, and answered the questions then propounded to him by the agents of the Internal Revenue Service. He was represented at this hearing, which commenced on October 29, 1958, by legal counsel. Petitioner's return for the taxable year 1953 was prepared by David W. Hall, a Miami, Florida, C.P.A. Petitioner was brought to Hall's office by James T. Benn who asked Hall to prepare the return. Prior to undertaking the preparation of the return petitioner was unknown to Hall. James T. Benn had many documents in his brief case which were offered to Hall in the preparation of petitioner's 1953 return. These documents were not used by Hall. He told Benn that he "would not wade through all those documents" and that if Benn would tell him what happened, how much he paid for an item and how much he sold it for, then he would prepare the return from his statements. Hall did not want to "put the weight of truth" in the documents because he did not know where they came from or whether they were true documents or not, and he did not have confidence in them. Moreover, he "found*306 out" that James T. Benn was involved in "quite a few" lawsuits and that many local people were "adverse" to Benn, and, inasmuch as the transactions were complicated, he preferred to have Benn tell him what happened. He prepared petitioner's 1953 return from a narrative by James T. Benn of the substance of the transactions and from figures given to him by Benn. James T. Benn informed Hall that the transactions were those of petitioner. Petitioner was present when James T. Benn made this statement and did not object to it. Hall did not discuss petitioner's return with James T. Benn unless petitioner was present. Petitioner was in the office of Hall at all times when James T. Benn was "narrating" the various transactions consummated by him in 1953 on behalf of petitioner. At the time the documents necessary to consummate these transactions were submitted to petitioner for his signature James T. Benn explained to petitioner they were acquiring or disposing of the property involved, and petitioner signed the documents because he knew his brother was looking out for his interest. The profit from the disposition of the $27,500 in promissory notes due from Virginia E. Peirce was omitted*307 from petitioner's 1953 return. Petitioner received full value for the notes in his acquisition of the interest of Paul Adams in the Hialeah Health Center. Petitioner did not advise Hall that these notes had been acquired in 1952 in connection with the sale of the stock of the Key West Ice Company; that that sale had been reported by petitioner in his 1952 return on the installment basis; and that the notes in 1953 had a cost basis of less than their face value. When Hall prepared petitioner's 1953 return he was aware only of the existence of the notes and their use in acquiring Adams' interest in the health center, and he treated them as having a basis equivalent to their face value. The sale of the $2,500 Peirce note to Mary L. Kennelly and Karen Bowman for $2,387.50 was not reported in petitioner's 1953 return. The sale on July 23, 1953, of Lot 9, Block 4, Ruck's Park to Juan Rachmuth for $2,500 was not reported in petitioner's 1953 return. Petitioner sold Lot 10, Block 3, Tamiami Highlands to Morris Glantz in 1953 and sustained a loss of $64.80. This sale was not reported in petitioner's 1953 return. In his income tax return for the year 1953, petitioner reported taxable*308 income of $6,235.01, consisting of $5,738.45 realized from trading in property and interest in the amount of $496.56. In his petition petitioner alleges that the "profit from business" of $5,738.45 was realized in the following transaction: * * * The profit from business resulted from the sale of the Villa Hermosa Hotel for $100,000, under agreement executed December 21, 1953, of which $90,000 was in purchase money mortgages. After discounting these mortgages to the extent of $15,000, and paying a $2,000 commission to one Terranova, petitioner reported $83,000 as the net selling price. The Villa Hermosa Hotel had been acquired with cash and other properties in a series of purchases, trades or exchanges at a cost of $77,261.55, including expenses of $1,570.20. Consequently, there was a profit of $5,738.45 as reported on petitioner's 1953 return. In the notice of deficiency respondent determined that the taxable income realized by petitioner in 1953 amounted to $50,259.41 in lieu of $5,738.45, and added $44,520.96 to the business income reported in his 1953 return. The $44,520.96 of additional income was determined by respondent in the following manner: INCOME FROM SALES AND OTHER SOURCES(a) Sale of Promissory Notes received on sale of Key West Ice Co. to PaulQ. Adams for Adams' interest in Hialeah Health Center$ 27,500.00(b) Sale of $2,500.00 note received on sale of Key West Ice Co. toMisses Mary L. Kennelly and Karen D. Bowman$ 2,500.00Less discount on sale112.502,387.50(c) Sale of Stock of Hudson Investors Co., Inc. to Mr.and Mrs. A. L. ShirleyReceived from Shirleys(1) Furnished residence at 7225 Belle MeadeBlvd.Fair market value$83,000.00Less Mortgage balance15,730.87Net Fair Market Value$ 67,269.1367,269.13(2) Two promissory notes of Mid-Florida Gas Co.($12,415.00 each)$24,830.00Less: discount, bond charges2,497.94Plus: accrued interest on notes$ 330.03Net received on notes22,662.09Less: prorations, stamps, and escrow fee perDrummond Title Co. statement$ 2,464.95Plus: proration taxes799.23$ 1,665.72Drummond Title Co. check to Capital Investors Co.20,996.37Less: cash advanced10,000.00Cash received on sale to Shirley$ 10,996.37(d) Sale of stock of All Fiberglass Awning Company for stock ofVilla Hermosa Corp. which owned Villa Hermosa HotelFair market value of hotel$100,000.00Less: Discount on sale of mortgages received on sale ofhotel for $100,000.0015,262.50Net amount of cash received from hotel84,737.50(e) Sale of Lot 10, Block 3, Tamiami Highlands to Morris Glantz1,000.00(f) Sale of Lot 9, Block 4, Ruck's Park$2,500.00Less: Proration taxes$ 14.82Stamps5.25Commission125.00145.07Net amount received2,354.93(g) Interest Income - per return: (1) On Wiley Street Mortgage, Hollywood, Florida414.00(2) On Crystal Court Mortgage, Miami, Florida82.56Gross receipts from Sales$196,741.99Cost Basis of Sales and Other Deductions(a) Cost basis of notes received on sale ofKey West Ice Co.Cost basis of $37,500 notes per Benn's1952 return$23,168.93Less: cost claimed in 19524,635.00Remaining cost$ 18,533.93(b) Basis of stock of Hudson Investors, Inc., thatowned Hialeah Health Center: (1) Promissory notes of Key West Ice Co.$27,500.00(2) Cash advanced on operation of HialeahHealth Center6,230.00(3) Payments to Frank M. Watkins to reinstatemortgage on Health Center3,457.85(4) Payments on principal on Belle Meaderesidence589.36(5) Miscellaneous expenses paid to A. C. Paoli1,443.11Basis in Hialeah Health Center$ 39,220.32(c) Cost basis to parcels transferred to All Fiberglass Awning Co.,inc.(1) Belle Meade furnished residence acquiredfrom Shirleys - fair market value67,269.13(2) Lot 2, Blk. 3, Ingleside Park im-proved with one-story ware-house Cash paid on acquisition1,139.29Principal payments on mortgage179.46Equipment and material cost3,000.004,318.75(3) Parcel 107 Arch Creek Estates less theS.W. 1/4 (unimproved)1,811.25(4) Cash paid to John Borgo, et al., per closingstatement10,476.34(5) Real estate commission225.00Total Cost basis of Property deeded to All Fiberglass84,100.47(d) Cost basis, Lot 10, Block 3, Tamiami Highlands1,064.80(e) Cost basis, Lot 9, Block 4, Ruck's Park1,500.00COST OF PROPERTIES SOLD$144,419.52Gross Profit52,322.47Other deductions: Interest: Warehouse mortgage$ 275.66Belle Meade mortgage310.64$ 586.30Taxes per return2.20Automobile expenses978.00$ 1,566.50Profit from business50,755.97Profit from business reported6,235.01Profit from business understated$ 44,520.96*309 At least part of the deficiency in petitioner's 1953 income tax was due to fraud with intent to evade tax. Opinion RAUM, Judge: Petitioner urges that he had no unreported taxable income for the year 1953. He concedes that the transactions considered by respondent in determining the deficiency for that year were his own transactions, rather than those of his brother James T. Benn, and he does not appear to question the respondent's determination in respect of the gross receipts from those transactions. His contention is that he is entitled to costs and deductions in addition to those allowed by respondent, the allowance of which would have the effect of eliminating the understatement of income determined by respondent. Respondent now concedes that evidence produced by petitioner discloses that he is entitled to the following additional costs: 1. $600 paid to William Roman for incorporating All Fiberglass Awning Company, Inc. and Hudson Investors Company, Inc. 2. $500 paid to Roland J. Lavelle for benefit of William Bruce to dismiss the lawsuit between Adams and Bruce. 3. $1,500 additional cost basis in equipment and material contained in warehouse described as Lot 2, *310 Block 3, Ingleside Park. Other additional costs claimed by petitioner, and the conclusions we have reached with respect to them, are considered below. $3,000 payment to Glantz Petitioner maintains that he paid Morris Glantz $3,000 in cash as part of the purchase price of Glantz's stock in Hudson Investors Company, Inc., and obtained a receipt therefor which was signed by Glantz. He relies upon a statement contained in a letter dated August 7, 1953 from a title company in which that company acknowledged the receipt from an attorney of the "Stock book of Hudson Investors Co., Inc. with Certificate No. 1 issued to Morris Glantz for 50 shares, dated June 22, 1953, which certificate has been cancelled, and reissued to Louis D. Benn", and a "Settlement Sheet" which reads as follows: Morris Glantz sold to Louis D. Benn fifty (50) shares or fifty (50) percent interest in Hudson Investors Co. Inc., a Florida Corporation for the sum of - $23,000.00. Key West Propane Gas Co., Notes - $20,000.00. Cash - $3,000.00. I do hereby acknowledge receipt of the above notes and cash and in lieu thereof I have endorsed stock certificate in favor of Louis D. Benn and have this day resigned*311 as officer and director of Hudson Investors Co. Inc., /s/ Morris Glantz MORRIS GLANTZ Morris Glantz testified that he and petitioner each received promissory notes in the amount of $37,500 when they sold their stock in the Key West Ice Company in 1952; that he gave $22,500 of the notes he received in that transaction to James T. Benn to purchase a 50 percent interest in Hudson Investors Company, Inc., the corporation to be formed to purchase the health center property; that in about a week or ten days James T. Benn voluntarily gave him $20,000 of the notes petitioner had received in the Key West sale and told Glantz he would return the note for $2,500 in thirty days; that he never received the $2,500 note; that he had no objection to receiving the $20,000 notes issued to petitioner in lieu of those issued to him because the notes were identical and were endorsed by petitioner; that James T. Benn told him he had used his notes and could not return them; that when James T. Benn gave him the $20,000 in notes he considered it to be a cancellation of their previous association in the Hialeah Health Center deal and not a sale of any interest he had in Hudson Investors Company, Inc. *312 ; that he did not receive a stock certificate of that corporation and has no recollection that such a certificate was ever issued to him or that he endorsed such a certificate to petitioner; that he never saw the stock book of Hudson Investors Company, Inc.; that he never received $3,000 in cash; that the signature on the document entitled "Settlement Sheet" is his signature that it was a blank piece of paper with "nothing on it" when he signed it; that sometime prior to the receipt of the $20,000 in notes, at the request of James T. Benn, he signed his name to this blank piece of paper at the Miami National Airport; that he was then making a trip to Wilmington, Delaware, on behalf of James T. Benn and Benn told him he wanted his signature on the paper so that he would have a tax record of the expenditures he was making for Glantz's trip to Delaware; and that he did not think that his action in signing the blank piece of paper at Benn's request was unusual because at that time he trusted Benn. The testimony of Glantz that he did not receive any stock of the Hudson Investors Company, Inc. and was not a stockholder of that corporation was corroborated by A. L. Shirley who in July 1953*313 acquired the stock and stock book of Hudson Investors Company, Inc. Shirley testified that when he received the stock book it contained the original stock certificates and that his recollection was that none of the original certificates had been torn out of the book. This Court has examined the so-called "Settlement Sheet" and all evidence submitted pertaining to the alleged payment of $3,000 in cash to Glantz. We are convinced that Glantz told the truth when he testified that he did not receive any cash payment. In the circumstances our conclusion is that petitioner's claim to an additional cost basis of $3,000 must be, and it is, denied. Payments to William Bruce Petitioner maintains that he paid William Bruce $7,300 in cash for his interest in the Hialeah Health Center and $1,250 for his interest in a subsequent lease, and that he lent $1,495 to Bruce through Alicia Carvell. In the early part of 1953, James T. Benn, acting on behalf of petitioner, became interested in acquiring the undivided one-half interest of Bruce in the Hialeah Health Center property. Benn's first offer was to pay Bruce $17,000 in cash for his interest, and subsequently he offered Bruce a 25 percent*314 interest in Hialeah Health Center, Inc., a corporation to be formed to take over the operation of the health center, in lieu of all monies. During the course of the negotiations which led up to the acquisition of Bruce's interest in the health center, James T. Benn submitted to Bruce for his signature various documents. These documents were confusing to Bruce because Benn would "shove them" at him, ask that they be executed immediately, and tell him "You will just have to trust me if you want this thing done and done in your favor." Bruce trusted Benn and signed the decuments. On or about March 26, 1953, Benn had Bruce sign an agreement which provided for the sale of his interest in the health center property for $1,000 plus a five year lease plus an option to purchase. On June 15, 1953, he had Bruce and his wife sign an unnotarized deed transferring Bruce's interest in that property for "the sum of Seven Thousand Three Hundred * * * Dollars to them in hand paid * * *." On or about June 22, 1953, he attempted, without success, to get Bruce to sign ten $2,000 notes, payable on demand with interest at six percent per annum, the security for the payment of which was to be a one-fourth*315 interest in the stock of the Hialeah Health Center, Inc. purportedly standing in the name of Bruce. And under date of July 25, 1953, he had Bruce sign an agreement providing for the assignment by Bruce to Capital Investors Co., Inc. of "all of my right, title and interest in and to all of my shares of Capital Stock of the HIALEAH HEALTH CENTER INC., and any and all other right, title and interest that I have or may have in and to the HIALEAH HEALTH CENTER, INC., in the name of WILLIAM D. BRUCE" "in consideration of Twelve Hundred fifty ($1,250.00) Dollars * * * the receipt whereof is hereby acknowledged." Petitioner's claim that he is entitled to additional cost bases of $7,300 and $1,250 is based upon statements with respect to the payment of those amounts contained in the agreements of June 15, 1953 and July 25, 1953. No evidence was produced by petitioner to show that these payments were actually made to Bruce, who denied having received them. The one person, other than Bruce, who knew whether these payments were made, was James T. Benn, but for reasons best known to petitioner, he was not called upon to testify. Bruce testified that he never received any money or stock for his*316 interest in the Hialeah Health Center property, and that he the June 15 and July 25, 1953 agreements. We heard his testimony and observed him on the witness stand. We are satisfied that although he may have been naive, he was honest and truthful. He was the victim of sharp, if not criminally illegal, practices. We are convinced that he told the truth, and that he did not in fact receive the amounts of $7,300 and $1,250 which petitioner seeks to have added to cost. We hold, therefore, that petitioner is not entitled to have the cost bases of his 1953 transactions increased by the amounts of $7,300 and $1,250. Petitioner also contends that he is entitled to an additional cost basis of $1,495 by reason of amounts advanced by James T. Benn to Bruce. He does not disclose how he arrived at this amount. The receipts in evidence, signed by Bruce, upon which he relies, total $1,027.20. Ten of those receipts for amounts totaling $322.20 show on their face that they represented amounts paid to Bruce to reimburse him for expenditures made on behalf of Hialeah Health Center, Inc. for sod, fill, shrubbery and for labor. Obviously there is no justification for treating this $322.20 as part of the*317 cost of acquiring Bruce's interest in the health center property. The remaining receipts, for $600, $50 and $55 purportedly were given for loans made by James T. Benn to Bruce. Even if it be assumed that they represented loans to Bruce by Benn, and we are not convinced that Bruce received the $600 as a loan, we fail to see any justification for treating amounts lent to Bruce as part of the cost of acquiring his interest in the health center property. If they were in fact loans which are to be attributed to petitioner and which were not repaid and became worthless, then petitioner's proper procedure would be to claim the deduction allowed by the applicable section of the Internal Revenue Code in the year they became worthless. Petitioner has not proved that they became worthless in 1953. Investment in Hialeah Health Center Petitioner contends that he is entitled to an additional cost of $11,466.07 for the profit from the exchange of Key West Ice Company notes reinvested as part of the cost of the purchase of the Hialeah Health Center. He argues that on January 1, 1953, he had $30,000 of the $37,500 in notes received on the sale of the Key West Ice Co.; that the notes amounting*318 to $30,000 had a cost basis of $18,533.93; that he received a $30,000 value from those notes in acquiring Adams' interest in the Hialeah Health Center, and thus received a taxable gain of $11,466.07; and that when he subsequently disposed of the Hialeah Health Center his basis, along with other costs, in part included the $30,000 that he had paid. We do not agree with petitioner. On January 1, 1953 he had $30,000 of the notes, acquired in connection with the sale of the Key West Ice Co., which had a cost basis of $18,533.93. In 1953, he used $27,500 of those notes in connection with the purchase of the interest of Paul Adams in the health center. The remaining $2,500 note was sold outright to Mary L. Kennelly and Karen D. Bowman for $2,387.50. Respondent included the face value of the $27,500 notes in income, along with the $2,387.50 received from the sale of the $2,500 note. He allowed an offset of $18,533.93 for petitioner's cost basis in the notes. In addition he allowed $27,500 as a cost of the stock of Hudson Investors Company, Inc. which acquired ownership of the Hialeah Health Center. Thus, in computing the deficiency respondent allowed petitioner all of the cost basis he*319 is entitled to receive by reason of his investment of $27,500 in notes in the Hialeah Health Center deal. 97th Street Residence Petitioner urges that his cost basis in the 97th Street residence was $9,159, and that he is entitled to have this amount added to his 1953 costs. 1 Title to this residence, which was purchased by James T. Benn for his own personal benefit on or about March 9, 1953, was placed in the name of petitioner. This property did not belong to petitioner and he had no investment therein. In July 1953, a trade of equities in certain properties was negotiated by James T. Benn with the Shirleys. On July 18, 1953, two exchanges were consummated pursuant to the provisions of two agreements dated July 18, 1953. One of these agreements covered the exchange by the Shirleys of the Belle Meade residence and two promissory notes in the total amount of $24,830 for $10,000 in cash and all of the capital stock of Hudson Investors Company, Inc., which owned the Hialeah Health Center and 12 adjoining lots. The other covered the exchange by the Shirleys of the Ott ranch for a residence on 97th Street and a purchase money mortgage on the Ott ranch in the amount of $53,000 to be*320 given to the Shirleys. The Shirleys had no objection to the incorporation of the two exchanges in one agreement, and indeed, from their point of view, regarded the entire matter as a single deal. But James T. Benn wanted two separate agreements and, at his request, the Belle Meade residence was transferred to Capital Investors Company, Inc., and the Ott ranch to Universal Investors Company, a corporation organized by James T. Benn for the purpose of acquiring the Ott ranch. The reason for this is obvious, for he was acting in his own behalf in respect of the 97th Street property and the Ott ranch but was acting in behalf of petitioner in respect of the exchange involving the Belle Meade property. In determining the deficiency, respondent correctly treated the exchange of the Belle Meade residence for the Hialeah Health Center property as a taxable transaction consummated by James T. Benn on behalf of petitioner. At the same time he properly refused to include therein the cost basis of the 97th Street property the taxable exchange of which must be attributed to James T. Benn, not to petitioner. In the circumstances, it is not necessary to consider respondent's persuasive alternative*321 argument that if the investment in the 97th Street property is to be added to petitioner's basis then there must likewise be attributed to him as additional income the value of the Ott ranch received on the exchange, that would more than offset the additional basis for the 97th Street property. *322 Legal fees paid to Herbert Blume Petitioner urges that he is entitled to an additional cost of $400 for legal fees paid to Herbert Blume for incorporating Hialeah Health Center, Inc. and Universal Investors Company, Inc. Blume testified that he incorporated these corporations; that the minimum fee charged by him for incorporating a corporation was $200; and that he was paid for incorporating Hialeah and Universal. We are convinced that Blume was paid a fee of at least $200 for incorporating Hialeah Health Center, Inc. on behalf of petitioner, and, even though the evidence does not disclose the exact amount of the fee, we hold that petitioner is entitled to have $200 added to the cost of acquiring the Hialeah Health Center. For reasons already noted in our consideration of the 97th Street residence cost, we are satisfied that Blume was not acting for petitioner when he incorporated Universal Investors Company, Inc. We hold, therefore, that petitioner is not entitled to any additional cost for the fee paid to Blume for incorporating that company. Parcel 107 Arch Creek Estates In March 1950 petitioner acquired Parcel 107 Arch Creek Estates, consisting of four lots, in exchange*323 for a $1,500 equity in a home and $915 in cash. Later in 1950 he transferred Parcel 107 to Ralph Adams in exchange for a note of Adams in the amount of $4,500. Adams sold Parcel 107 to Daniel Abrahams in December 1950, in exchange for mortgages. A second mortgage given by Abrahams to Adams was subsequently assigned by Adams to Harry F. Strenglein as security for $1,200. In 1952, petitioner paid Strenglein $1,000 for the second mortgage in order to get him to release his claims against Parcel 107, made an airplane trip to Chicago to get Abrahams to execute a quitclaim deed, and reacquired Parcel 107 from Abrahams. In 1953, three of the lots in Parcel 107 were transferred to All Fiberglass Awning Co., Inc. in connection with the exchange of stock of that corporation for stock of the Villa Hermosa Corporation. Petitioner contends that when the four lots comprising Parcel 107 Arch Creek Estates were originally purchased the seller accepted a $1,500 equity in a home as part of the purchase price; that in addition he paid the seller $915 in cash; that there were Federal revenue stamps affixed to the deed indicating that he paid at settlement an additional $585; that he paid $1,000 to*324 Harry Strenglein for a quitclaim deed; that he spent about $500 on the trip to Chicago to get Daniel Abrahams to execute a quitclaim deed; and that three-fourths of these amounts totalling $4,500, or approximately $3,350 should be allowed as his basis in the three lots in Parcel 107 Arch Creek Estates transferred to All Fiberglass Awning Company, Inc. in 1953. In determining the deficiency, respondent allowed $1,811.25 as the cost basis of the three lots in Parcel 107 Arch Creek Estates transferred to All Fiberglass Awning Company, Inc. in 1953. This amount is threefourths of $2,415, part of which was the $1,500 allowed by the seller for petitioner's equity in the home and the remainder the $915 in cash paid by petitioner to her. Respondent now contends that petitioner is entitled to use as his cost basis only the portion of the amount expended in reacquiring title to four lots in Parcel 107 which is attributable to the three lots disposed of in 1953. Respondent urges that the only amount expended by petitioner in reacquiring Parcel 107 was the $1,000 paid to Strenglein for a quitclaim deed, and, therefore, the cost basis to which he is entitled is three-fourths of that amount, or*325 $750. It is apparent from petitioner's contention that he seeks to treat as his cost basis of Parcel 107 in 1953, the cost of acquiring it in 1950 plus the cost of reacquiring it after its sale to Adams and after Adams had transferred it to Abrahams. He is clearly not entitled to such a basis. His right to claim the original acquisition cost of Parcel 107 as his basis for gain or loss ceased when he sold that property in a taxable transaction to Adams in 1950. When he later reacquired Parcel 107, the amounts expended by him in connection with its reacquisition became his basis for gain or loss in any subsequent disposition. They consisted of the $1,000 paid to get a quitclaim deed from Strenglein, and the amounts he expended on his trip to Chicago to get a quitclaim deed from Abrahams. Although the exact amount of his expenditures on that trip has not been established, we are convinced that some allowance should be made for them. Using our best judgment, and following the suggestion in Cohan v. Commissioner, 39 F. 2d 540, 544 (C.A. 2), we have found that the expenditures on*326 that trip amounted to $225. Thus we find that petitioner made expenditures of $1,000 and $225 in reacquiring title to Parcel 107, or a total of $1,225, and, inasmuch as only three of the four lots in Parcel 107 were transferred to All Fiberglass Awning Co., Inc. in 1953, petitioner is entitled to a cost basis for the three lots of three-fourths of $1,225, or $919. Real Estate Commission paid to Nicholas Terranova After acquiring the Villa Hermosa Hotel on December 18, 1953, petitioner entered into an agreement on December 21, 1953, to sell the hotel to Camp Ideal, Inc. for $100,000 and the sale was completed on January 9, 1954. A real estate commission on the sale was paid to Nicholas Terranova in the amount of $2,000, $500 of which was paid on December 22, 1953, and the remaining $1,500 on January 11, 1954. The examining internal revenue agent testified that he treated the entire commission of $2,000 as an offset against the selling price in determining there was no deficiency for 1954. Petitioner urges that the $2,000 is deductible as a business expense in computing his taxable income for 1953. *327 Commissions on real estate sales paid by persons other than dealers are not deductible as business expenses but are treated as an offset against the sales price in determining the gain or loss from such sales. Irma Jones Hunt, 47 B.T.A. 829, 839; I.T. 2305, V-2 C.B. 108. In his return for 1953 petitioner stated that his principal business activity was that of "Building Contractor" and the evidence discloses that during that year he participated in certain transactions involving real estate. Although he might thus be characterized as a trader or speculator he certainly was not a dealer. In the circumstances, respondent did not err in failing to allow him a business expense deduction in 1953 for the commission paid to Terranova, of which $1,500 was in any event not deductible in 1953 since it was paid in 1954. Miscellaneous Transactions Petitioner urges that $1,575.47 of the $2,387.50 received by him on the sale of the $2,500 Peirce note to Mary L. Kennelly and Karen D. Bowman represented a return of capital. We do not agree. He had a cost basis in the $30,000 Peirce notes which he held as of January 1, 1953 of $18,533.93. His cost basis in the $2,500 note was, therefore, *328 $1,544.49. The cost basis of $18,533.93 was allowed by the respondent in determining the 1953 deficiency. Petitioner urges that he is entitled to an addition to the cost basis of $1,500 allowed by respondent on the sale of Lot 9, Block 4, Ruck's Park. He relies upon his testimony to the effect that after he acquired the lot in 1949 from Mrs. Tennyson in exchange for a home owned by him he made some expenditures for repairs on the home and that he figured these expenditures when added to the $1,500 cost of the lot would be in excess of the $2,500 received therefor. Petitioner did not mention the amount of such expenditures and, even if he had, he has not established that those expenditures were of a capital nature so as to entitle him to an increase in the cost basis of the lot. He has not sustained his burden of proving that the respondent erred in his determination that the cost basis of the lot was $1,500. Fraud There remains the question whether petitioner is liable for an addition to tax under section 293(b) of the Internal Revenue Code of 1939. His liability therefor depends upon*329 whether part of the deficiency for the year 1953 was due to fraud with intent to evade tax. Respondent had the burden of proving fraud by clear and convincing evidence. Petitioner contends that respondent has not sustained that burden. He urges that he made available to the certified public accountant who prepared his 1953 return all of the documents relating to every transaction consummated by him in that year, and that he filed his 1953 return with the belief that it truly and correctly portrayed the taxable transaction for 1953. The evidence discloses that petitioner realized substantial unreported taxable income in 1953 upon the disposition of $27,500 of Peirce notes in acquiring the interest of Paul Adams in the Hialeah Health Center; the sale of a $2,500 Peirce note to Mary L. Kennelly and Karen Bowman; the sale of stock of Hudson Investors Company, Inc. (nominal owner of Hialeah Health Center property); and the sale of Lot 9, Block 4, Ruck's Park. The evidence also discloses that petitioner was advised by his brother of the various transactions which were being consummated on his*330 behalf; that he caused to be organized dummy corporations in whose names they were consummated and signed some of the documents involved in the transactions; and that he was present when David W. Hall, a certified public accountant, received from James T. Benn the figures and data relating to these transactions. We are satisfied that petitioner knew that he had realized taxable income in an aggregate amount far in excess of what appeared on his 1953 return when he signed it, and that he was not a mere innocent beneficiary of the erroneous and incomplete information given by his brother to the accountant who prepared the return. The evidence is clear and convincing that at least part of the deficiency was due to fraud with intent to evade tax, and we have made a finding to this effect. We hold that petitioner is liable for the addition to tax imposed by section 293(b) of the Internal Revenue Code of 1939. We recognized that in approving the basic deficiency, as revised, we relied in respect of some items upon petitioner's failure to carry his own burden of proof; and, of course, such failure*331 of proof cannot be relied upon in establishing fraud. We were therefore careful not to take such items into account to that extent in finding that the record otherwise established the requisite fraud. Decision will be entered under Rule 50. Footnotes1. On page 35 of his brief petitioner says "That petitioner had an equity and cost of $9,159.00 is evidenced by Ex. 21-X, 22-Y, evidencing (1) a $5,000.00 down payment, $2,500.00 paid on deed of trust on June 24, 1953, and $1,118.62 paid at settlement. It must be assumed that the $2,500.00 payment on the trust was made since Mr. Shirley testified that he received everything due him." These three payments total $8,618.62 and not $9,159. Exhibits 21-X and 22-Y show that the payments of $5,000 and $1,118.62 were made, or a total of $6,118.62. The purchase agreement (Ex. 21-X) provided for the first payment of $2,500 on the unpaid balance of the purchase price to be made on June 24, 1953. On page 169 of the transcript Shirley stated that the equity he was to get in the 97th Street house was $7,500. This no doubt included the $5,000 down payment and the $2,500 June 24, 1953 payment. Those payments, when added to the $1,118.62 paid on settlement (see Ex. 22-Y), show that the basis in the 97th Street property was $8,618.62. But this was James T. Benn's basis, not petitioner's.↩